UNITED STATES of America,

v.

**Santiago MEJIA, Nicolas Aguilar, Miriam Acosta, Anna Maria Acosta, Francisco Lopez, Ruth Lopez, Antonio Bermudez and Yolanda Acosta, Defendants.**

**No. 83 Crim. 501.**

United States District Court, E.D. New York.

Jan. 9, 1984.

Peter J. Fabricant, New York City, for Santiago Mejia.

Paul E. Warburgh, Jr., New York City, for Francisco Lopez.

Martin L. Schmukler, New York City, for Antonio Bermudez.

Robert Blossner, New York City, for Nicolas Aguilar.

Joan Azrack, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y., for plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW.

GLASSER, District Judge.

The defendants Antonio Bermudez a/k/a "Larry Landa" and Francisco Lopez and Santiago Mejia were indicted together with others, charged with conspiracy to possess with intent to distribute, and with possessing with intent to distribute cocaine. Motions were made on behalf of Bermudez to suppress physical evidence claimed to have been the product of a warrantless search and seizure in violation of the Fourth Amendment; to suppress post-arrest statements unlawfully obtained from him in violation of the Fifth and Sixth Amendments; to dismiss the indictment against him as being insufficient on its face and as being based on unsupported evidence and for a severance of the charges against him.

On behalf of the defendant Lopez, a motion was made to suppress physical evidence seized incident to a warrantless search; statements which the defendant may have made at the time of his arrest and physical evidence seized after a search warrant was obtained for the reason that the facts upon which the search warrant was issued were illegally obtained.

On behalf of the defendant Mejia a motion was made to suppress physical evidence claimed to be the product of a warrantless search and seizure of contraband from an automobile which he was operating at the time of his arrest. It is claimed that the search and seizure were violative of his Fourth Amendment rights.

A hearing was held on the motions of Bermudez and Lopez. On the following day, Mejia's motion was to be heard. Mejia's attorney advised the Court that he was present during the hearing on the preceding day and heard all the testimony that was elicited. Rather than recall the same witnesses and having their testimony elicited again, a stipulation was entered into between Mejia and the Government that that testimony may be considered by the Court for purposes of his motion. In addition, the following facts were also made part of the stipulation:

On the evening of November 8, 1983, when Santiago Mejia was observed leaving 4504 Kings Highway, Brooklyn, for the second time that evening, Mejia was carrying an opaque plastic bag which he placed in the trunk of the car he had been driving all evening. Mejia was then arrested after driving several blocks from the Kings Highway address. After placing Mejia under arrest, agents searched the car and its trunk. In the trunk they found an unfastened green garbage bag. The garbage bag was found to contain the opaque plastic bag Mejia had been observed carrying from the Kings Highway residence. Further contained in the plastic bags were three opaque plastic containers each containing a white powder substance later analyzed to be cocaine hydrochloride.

The defendant, who was present, indicated in response to an inquiry by the Court that he understood the stipulation entered into and that he consented to it.

After a hearing, this Court makes the following findings of fact.

Yvette Torres, a Special Agent of the Drug Enforcement Agency and Detective Walter Alicea, a New York City detective assigned to the New York Drug Enforcement Task Force were, at all relevant times for purposes of this case, operating in an undercover capacity in the role of drug buyers and holding themselves out to be brother and sister.

On the night of November 8, 1983, they met with Santiago Mejia and Nicolas Aguilar, from whom Torres had previously negotiated to purchase 8 kilograms of cocaine. Mejia informed them that only 5 kilograms were then available and when pressed for the 8 kilograms by Detective Alicea, telephoned a number which was observed by other agents and later determined to be a telephone number registered to a subscriber at 4504 Kings Highway in Brooklyn. After concluding the phone call, Mr. Mejia again advised that only 5 kilograms were available. After some discussion about where the transaction would be completed, Special Agent Torres drove Mejia and Aguilar to 89–09 55th Avenue in Queens for the purpose of being shown the place where the sale would be consummated at 11:00 P.M. that evening.

Mejia, Aguilar and two women were then observed leaving 89–09 55th Avenue and driving to 4504 Kings Highway in Brooklyn, which was described as a one-family house. They entered and remained for approximately 30–45 minutes. When they left those premises, Aguilar was observed carrying what appeared to be a cake pan covered with tinfoil which was placed in the trunk of their car. They returned to 89–09 55th Avenue and Aguilar carried that pan into those premises.

At approximately 11:00 P.M., as had been pre-arranged, Special Agent Torres and Detective Alicea were met on the street by Mejia and Aguilar who told them that only 1 kilogram of cocaine was then available and that it was at 89–09 55th Avenue. Detective Alicea told Mejia that he was interested in buying 5 kilograms or none at all and Mejia said he would get the other 4 kilograms and would return within an hour.

Shortly thereafter, Mejia, a woman later identified to be Miriam Acosta, and a confidential informant were followed as they drove to the house at 4504 Kings Highway. Mejia entered that house while the others remained in the car. Ten minutes later, Mejia was observed carrying a plastic bag from that house which he placed in the trunk of his car and drove away. The car was permitted to travel two or three blocks before it was stopped by Special Agents and the occupants placed under arrest. In the trunk of the car was the plastic bag which was found to contain three kilograms of white powder, later confirmed to be cocaine.

The officers, more particularly Detective Vincent Colangelo and Special Agent Robert Palombo (and others) immediately returned to 4504 Kings Highway. They were aware of every detail of what had occurred until that time through radio communication with Detective Alicea and Special Agent Torres. They knew, for example, that Mejia was to return to 89–09 55th Avenue within the hour where he was to again meet with the undercover team and deliver 4 kilograms of cocaine; they knew that Aguilar was still at 89–09 55th Avenue; they knew that Mejia had only 3 kilograms of cocaine in the car and they believed that the 4th kilogram was still at 4504 Kings Highway (which, in the vernacular of the drug trade, they believed was the "stash pad" of these drug dealers). They believed that the occupants of 4504 Kings Highway would learn very soon that Mejia did not return to 55th Avenue and they believed that unless they acted swiftly the 4th kilogram of cocaine and perhaps more would be destroyed.

Based upon the information available to them and the beliefs they derived from that information, the officers attempted to gain entrance to the premises by ruse. Detective Colangelo knocked on the door and asked for "Mr. Vargas." When the person responding to the knock said that there was no Mr. Vargas there and refused to open the door, Detective Colangelo identified himself as a police officer. He testi-

fied that at that moment he heard a lot of scurrying and movement inside and when entry was again refused, he and the other officers opened. the door forcibly. On the second floor landing Detective Colangelo found Bermudez in pajamas. Bermudez was directed to remain calm and place his hands against the wall. Lopez, in his underwear, was found by Special Agent Palombo hiding in a vestibule near a stairway and he was placed under arrest. Also in the house were Ruth Lopez and two children. A protective sweep followed. Two plastic bags containing white powder were found in a bedroom in an open bureau drawer, a "hot box" on a night stand, and an Ohaas scale, known to be frequently used to weigh narcotics was found in the bathroom. Bermudez and Lopez were placed under arrest. They were advised of the Miranda warnings and refused to make statements. Bermudez requested permission to contact an attorney. Detective Colangelo believed that he learned from Bermudez that he had recently driven north from Florida and was a visitor at the house. He also believed that Bermudez informed him that the automobile bearing New Jersey license plates parked outside was his.

Within fifteen minutes of the protective sweep, Special Agent Palombo testified, he had a telephone conversation with an Assistant United States Attorney, informed her about what had thus far transpired and inquired about obtaining a search warrant. He said that the Assistant United States Attorney advised him that because of the lateness of the hour (it was by then approximately 1:00 A.M. of the morning of November 9, 1983), it would be best if the application for a search warrant were made first thing in the morning. Detective Alicea and Special Agent Torres were then advised of the arrest of Mejia, Bermudez and Lopez and they arrested Aguilar in the vicinity of 89–09 55th Avenue in Queens. Taken from his person was a loaded .22 caliber pistol.

Detective Colangelo testified that following the communication with the Assistant United States Attorney, he and others remained at 4504 Kings Highway to secure the premises.. No further search was made until after the search warrant was issued some fifteen or sixteen hours later at 4:10 P.M. on November 9th. After the warrant was issued, the premises were searched and a quantity of cocaine (estimated to be about 1 kilogram) was found with packaging containing the same markings as the 3 kilograms of cocaine taken from the automobile in which Mejia was arrested.

The physical evidence seized from 4504 Kings Highway is sought to be suppressed by Bermudez and Lopez who contend that that evidence was obtained in violation of their rights secured to them by the Fourth Amendment of the United States Constitution against unreasonable search and seizure. Bermudez moves to suppress his statements pertaining to his arrival from Florida and his ownership of the automobile registered in New Jersey as being obtained in violation of the rights secured to him by the Fifth Amendment of the United States Constitution.

A. *Mejia's Motion to Suppress the Evidence Seized from the Automobile*

■ The existence of probable cause to arrest Mejia is contested *pro forma.* Given the facts described as found, more particularly, Santiago Mejia's role in negotiating with Special Agent Torres and Detective Alicea for the sale to them of substantial quantities of cocaine and his role in obtaining the cocaine to be delivered, a challenge to the existence of probable cause could not be seriously made. Based upon those facts, I conclude, as a matter of law, that the agents had probable cause to intercept and arrest Mejia shortly after his departure from 4504 Kings Highway for they surely had reason to believe that a crime was being committed and that Mejia was committing it. *United States v. Marin,* 669 F.2d 73 (2d Cir.1982).

Given a lawful arrest, was the warrantless search of the plastic bags in the trunk of the automobile lawful? *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Chambers v. Maroney,*

399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *Robbins v. California*, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981), and countless cases concerning automobile searches decided by other courts have provoked thinly veiled cries of frustration in the effort to distinguish one case from another and to find the touchstones that would serve as reliable guides in arriving at correct Fourth Amendment answers to those cases. Illustrative is this frequently cited sentence from LaFave, "Case-By-Case Adjudication" versus "Standardized Procedures": The Robinson Dilemma, 1974 S.Ct.Rev. 127 at p. 141: "A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be 'literally impossible of application by the officer in the field.'" *See New York v. Belton, supra,* 453 U.S. at p. 458, 101 S.Ct. at p. 2863.

That lawyers or at least judges "eagerly feed" upon that heady stuff is debatable. Fourth Amendment problems occupy "much of the attention of courts at all levels of the state and federal judiciary. Courts and law enforcement officials often find it difficult to discern the proper application of ... principles to individual cases, because the circumstances giving rise to suppression requests can vary almost infinitely. Moreover, an apparently small difference in the factual situation frequently is viewed as a controlling difference in determining Fourth Amendment rights." *Arkansas v. Sanders, supra,* 442 U.S. at p. 757, 99 S.Ct. at p. 2589. See also the dissenting opinion of Justice Brennan in *New York v. Belton, supra,* 453 U.S. at p. 470, 101 S.Ct. at p. 2869. Judges are agreed on the importance of striving for clarification in this area of the law. *Unit-*

*ed States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

The defendant relies upon *United States v. Chadwick, Arkansas v. Sanders,* and *New York v. Belton, supra.* He would distinguish *United States v. Ross.*

In *Chadwick,* the Supreme Court considered whether movable, closed containers were embraced by the rationale underlying the automobile exception to the warrant requirement of the Fourth Amendment. The container in that case was a double-locked footlocker which was loaded into the trunk of a car and which was reasonably believed to be filled with marijuana. Upon the facts before it, the court held that the automobile exception was not applicable. The diminished expectation of privacy upon which that exception is based in part did not apply, said the court, to the footlocker or other closed luggage. The mobility of movable closed containers upon which the exception is also based, did not justify the warrantless search because the footlocker, having come under the control of the police, was not subject to loss or destruction pending the obtaining of a warrant.

In *Sanders,* the court considered whether closed containers in an automobile may be examined as part of a proper search of the car under the automobile exception. In that case, the police removed and searched a green suitcase from the trunk of a taxi, having been previously advised by a reliable informant that the defendant would be carrying contraband in that suitcase. The court held the warrantless search of the suitcase invalid stating that since the police had already seized the suitcase, the extent of its mobility was not affected because it was taken from an automobile. That is to say, the probable cause to search was focused on the suitcase and not on the taxi and the fact that the suitcase was placed in the trunk of the taxi did not furnish probable cause to believe that other contraband was in the taxi to make applicable the automobile exception.

In *Belton,* the Supreme Court sustained the search of the pockets of a jacket located inside the passenger compartment of a

car which was searched incident to a lawful custodial arrest. The principle there announced was "that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile" and he "may also examine the contents of any containers found within the passenger compartment, ..." In a footnote defining what it meant by "container," the court added that its "holding encompasses only the interior of the passenger compartment of an automobile and does not encompass the trunk." 453 U.S. 454, 460, 461, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768.

In *Ross*, the Supreme Court expanded the scope of the automobile exception to the warrant requirement of the Fourth Amendment. In *Ross*, a reliable informant advised the police that a man was selling narcotics he kept in the trunk of a "purplish maroon" Chevrolet Malibu with District of Columbia license plates. The car was subsequently stopped by the police and the defendant ordered to get out of the vehicle. A warrantless search of the car was then conducted. The trunk was opened and in it was found a closed brown paper bag in which, upon examination, were a number of glassine bags containing a white powder later determined to be heroin. Considered by the court was "the extent to which police officers—who have legitimately stopped an automobile and who have probable cause to believe that contraband is concealed somewhere within it—may conduct a probing search of compartments and containers within the vehicle whose contents are not in plain view." "We hold," the court said, "that they may conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant 'particularly describing the place to be searched.'" 456 U.S. 798, 800, 102 S.Ct. 2157, 2159, 72 L.Ed.2d 572.

The defendant argues that the holding in *Ross* does not reach this case. He contends that *Sanders* is controlling and that the decision in that case was not disavowed by *Ross*, in which the court said, at p. 824,

102 S.Ct. at p. 2172, "Although we have rejected some of the reasoning in *Sanders*, we adhere to our holding in that case." He contends in short that probable cause to believe that the plastic bag carried by Mejia from 4504 Kings Highway and placed in the trunk of the car contained contraband did not justify a search of the entire car. *See United States v. Ross, supra*, at page 824, 102 S.Ct. at page 2172.

■ There is a superficial resemblance between this case and *Sanders*. The difference which in my view justifies a contrary result is that the police were indifferent to the taxi in *Sanders*. It was a vehicle of no special significance to them. The automobile here was an object of police surveillance over a number of hours, if not days. They knew that it was previously used by Mejia to transport narcotics. They knew it was the vehicle which brought Mejia to the place at which he was to obtain the additional four pounds of cocaine and in which he was to transport it to the point of delivery. In short, this automobile, unlike the taxi in *Sanders*, was not a matter of indifference to the police, and in that regard is more appropriately equated with the Chevrolet in *Ross*, in the trunk of which the police were told Ross kept narcotics. There were articulable facts in this case to justify the issuance of a warrant to search the automobile in other parts of which the police could justifiably have believed were additional amounts of drugs or weapons— trafficking in drugs being a dangerous business and to "substantial dealers in narcotics firearms are tools of the trade." *United States v. Martinez-Gonzalez*, 686 F.2d 93, 101 (2d Cir.1982). The motion by Santiago Mejia to suppress the drugs seized from the trunk of the automobile is, therefore, denied.

B. *Motion to Suppress by Bermudez and Lopez*

■ The entry into the premises 4504 Kings Highway, Brooklyn, New York and the arrests and protective sweep made immediately thereafter were without benefit

of a warrant and were, therefore, per se unreasonable, unless embraced by a recognized exception which would place upon such search and seizure the imprimatur of reasonableness. The exigent circumstance is the only exception urged by the Government as being applicable.

Before considering the applicability of that exception to the facts of this case, a logical sequential analysis would require an initial determination of the standing of either Bermudez or Lopez to assert a Fourth Amendment right. If to establish his standing, a defendant testified at a suppression hearing that he owned or possessed the item seized or the place where it was found and his testimony could thereafter be used against him at his trial for all purposes, the defendant would be confronted with a difficult and even unfair dilemma. The Court in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) resolved the problem of the defendant thus situated by announcing an automatic standing rule. "[The] possession on the basis of which petitioner is to be and was convicted suffices to give him standing under any fair and rational conception of the requirements of Rule 41(e)." 362 U.S. 257, 264, 80 S.Ct. 725, 732, 4 L.Ed.2d 697. Thereafter, in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) the dilemma addressed in *Jones* was ameliorated still further by a holding that the testimony given by a defendant in order to establish his "standing" to object to illegally seized evidence may not thereafter be used against him at trial on the issue of guilt. Still later, in *U.S. v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), the "automatic standing" rule of *Jones* was overruled, the Court holding that a defendant charged with a crime of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated. The "standing" concept was replaced by the "expectation of privacy" idea in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) and "the automatic standing rule of *Jones* ... outlived its usefulness in [the] Court's Fourth Amendment jurisprudence." *U.S. v. Salvucci, supra*, 448 U.S. at p. 95, 100 S.Ct. at p. 2554.

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130–31, n. 1, 99 S.Ct. 421, 423–24 n. 1, 58 L.Ed.2d 387 (1978). The proponents of this motion, Bermudez and Lopez, offered no testimony which would establish an expectation of privacy in the premises in which they assert Fourth Amendment rights although they allege facts which would establish such an expectation in affidavits they submitted in support of their motions. Their failure to offer testimonial evidence in open court to establish their Fourth Amendment rights may be explained by the related failure of the Government to make any challenge at the suppression hearing to their standing to raise their Fourth Amendment claim. *Combs v. United States*, 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed.2d 308 (1972). Without passing upon the sufficiency of their affidavits for this purpose, this motion will be determined on the assumption that they had such an expectation of privacy which they could have established testimonially in open court had the Government challenged their right to assert their Fourth Amendment claim.

In relying entirely on the exigent circumstance exception, the Government argues that the agents had probable cause to believe that the source of the cocaine seized from Mejia's automobile was 4504 Kings Highway and that there was at least one additional kilogram of cocaine in those premises because they knew that Mejia had come there to obtain four kilograms of cocaine for delivery to Torres and Alicea and that only three kilograms were taken from that vehicle. The agents had proba-

ble cause to believe that others were present at 4504 Kings Highway because they knew that Mejia had been there earlier that evening and they also knew that he had made two telephone calls in connection with the drug transactions and drove to the Kings Highway address after each. The Government also argues that the occupants of 4504 Kings Highway would soon become aware of Mejia's arrest and might destroy such drugs as still remained there and, finally, the sounds and scurrying from within after they announced their presence furnished the officers with reason to believe that evidence might be destroyed. If successful in legalizing the presence of the officers within the house, the Government would then invoke the "security check" and "plain view" principles to legalize the warrantless seizure. *United States v. Vasquez*, 638 F.2d 507 (2d Cir.1980); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

■ The preconditions to justify a warrantless entry into premises following an arrest outside those premises for a security check to prevent the destruction of evidence were set forth in *United States v. Agapito*, 620 F.2d 324 (2d Cir.1980) at p. 336 n. 18, as follows:

> The arresting officers must have (1) a reasonable belief that third persons are inside, and (2) a reasonable belief that the third persons are aware of the arrest outside the premises so that they might destroy evidence, escape, or jeopardize the safety of the officers or the public.

A literal application of those preconditions to the facts here would compel the conclusion that the warrantless entry for a security check to prevent the destruction of evidence was not justified. The first precondition was satisfied in that the officers had a reasonable belief that third persons were inside the premises 4504 Kings Highway. That belief was justified by the two visits to those premises known to have been made by Mejia, the telephone calls to those premises and the sounds and scurrying from within that Detective Colangelo testified he heard. If the second precondition requires the officers to have a reasonable belief that the third persons are presently aware of the arrest outside the premises, then that precondition has not been satisfied. The arrest of Mejia took place two or three blocks from 4504 Kings Highway. There was no testimony that the occupants had any knowledge of that arrest when the officers arrived at the door. In *Agapito*, the occupants of a 17th floor hotel room were arrested in the hotel lobby. There was no reason to believe that any other person was in the room since extended surveillance did not reveal any other occupant or a visitor to the room. Given those facts, the warrantless entry into the hotel room was held to be unlawful. In *United States v. Segura*, 663 F.2d 411 (2d Cir.1981), the defendant was arrested in the lobby of the apartment building two floors below the apartment later searched. The arrest could not have been observed by anyone in the apartment nor was there any reason to believe that anyone was there. Given those facts, the warrantless entry into and search of that apartment was held to be unlawful.

The facts in this case are distinguishable in that there were persons at two geographically separated locations who, at each place, were aware of the details of the drug transaction in progress which was proceeding from one location to the other and who, the officers knew, had previously been in telephonic communication with each other. Given such facts, the second precondition of *Agapito* might be modified to read that "the arresting officers must have ... (2) a reasonable belief that the third persons are *or will imminently become* aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or public." As so modified, the second precondition is clearly met.

■ In any event, the existence of exigent circumstances is *not* limited to circum-

stances indicating the destruction of evidence. *United States v. Martinez-Gonzalez*, 686 F.2d 93, 100 (2d Cir.1982). There are many factors that may be used to determine whether "exigent circumstances are present. These include (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed;" (3) "a clear showing of probable cause to believe that the suspect committed the crime;" (4) "strong reason to believe that the suspect is in the premises being entered;" (5) "a likelihood that the suspect will escape if not swiftly apprehended;" and (6) the peaceful circumstances of the entry.'" *United States v. Reed*, 572 F.2d 412, 424 (2d Cir.1978). That "list is illustrative, not exclusive; other factors may be relevant. Moreover, the absence or presence of particular factors is not conclusive. The determination of exigent circumstances ... necessarily turns upon whether in light of all the facts of the particular case there was an 'urgent need' that 'justifies' a warrantless entry." *United States v. Martinez-Gonzalez*, 686 F.2d 93, 100 (2d Cir. 1982).

■ The law of search and seizure, in the final analysis, entails a delicate and sensitive balancing of two fundamental principles. On one side of the beam is the principle that the privacy of one's home and the security and integrity of the person are basic human rights. On the other side is the principle that a civilized society must permit its authorized officials, in specified instances, to trespass upon those basic rights in the interest of enforcing its laws. Mindful that the "Fourth Amendment has drawn a firm line at the entrance to the house" and that "absent exigent circumstances that threshold may not reasonably be crossed without a warrant," *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), I nevertheless find that, upon the totality of the circumstances in this case, the officers were faced with exigent circumstances which were not of their own making and that the balance tips in favor of law enforcement. Events which, viewed singly by an untrained eye, might be susceptible of an innocent interpretation, but when viewed collectively by experienced police officers who have seen that pattern of behavior many times before, provide a reasonable, objective basis for suspicion that the occupants of 4504 Kings Highway were engaged in criminal activity. *United States v. Gomez*, 633 F.2d 999, 1005 (2d Cir.1980). They knew that three kilograms rather than four were taken from Mejia's car and had reason to believe that the fourth and probably more were still in the premises since drug dealers "such as Mejia were unlikely to store drugs at their own residences; instead they store the drugs in a 'stash pad' elsewhere." *United States v. Gomez*, 633 F.2d 999, 1005 (2d Cir.1980). Narcotics trafficking is a serious offense and often involves violence. *United States v. Martinez-Gonzalez*, 686 F.2d 93, 100–101 (2d Cir.1982). To substantial dealers in narcotics, firearms are tools of the trade. *United States v. Martinez-Gonzalez, supra*, at p. 101. The agents had reason to believe, as has been previously noted, that the occupants of 4504 Kings Highway would soon become aware that something had gone awry with their transaction and that delay might result in the destruction of evidence. For the foregoing reasons, the motion to suppress the fruits of the warrantless search and seizure is denied.

■ The defendants Bermudez and Lopez contend that the evidence seized after the warrant was issued should be suppressed for the reason that the unreasonableness of the delay in obtaining the warrant requires that result. Even if the initial entry were deemed to be illegal, the post-warrant evidence would be admissible. There was probable cause to issue the warrant based upon facts known to the police officers before the initial entry was made. The validity of the warrant has not been challenged for the reason that probable

cause to issue it was lacking, but rather because the issuance of the warrant was so long delayed. In this respect, this case is indistinguishable from *United States v. Segura*, 663 F.2d 411 (2d Cir.1981) in which a delay of nineteen hours in the issuance of a warrant during which police remained unlawfully on the premises was held to be non-fatal. The motion of defendants Bermudez and Lopez to suppress the post-warrant evidence is, therefore, likewise denied.

C. *Post-Arrest Statements*

■ The motion by Bermudez and Lopez to suppress post-arrest statements that each might have made is granted. The Government has failed to establish that there was a knowing, intelligent and voluntary waiver of Miranda rights by either Bermudez or Lopez.

D. *Motion to Dismiss Indictment or Sever*

■ The defendant Bermudez moved to dismiss the indictment against him as being insufficient on its face and as being based on unsupported evidence. As to sufficiency, the indictment satisfies the requirements of Rule 7(c)(1) of the Fed.R. Crim.P. in that it contains a plain, concise and definite written statement of the essential facts constituting the offense charged. As to the contention that the indictment is based on unsupported evidence, the general rule is that a defendant may not successfully attack a facially valid indictment on the ground that during the grand jury investigation the government presented inadequate or incompetent evidence. *Costello v. United States*, 350 U.S. 359, 363–364, 76 S.Ct. 406, 408–409, 100 L.Ed. 397 (1956) and

I see no reason to depart from that general rule here.

■ His alternative request for severance is based upon his belief that the evidence against his co-defendants is so disproportionately greater than is the evidence against him that he will be prejudiced by a joint trial. A defendant is not entitled to a severance because the prosecution's proof may be stronger against a co-defendant. *United States v. Williams*, 604 F.2d 1102, 119 (8th Cir.1979); *United States v. Anderson*, 626 F.2d 1358, 1373 (8th Cir.1980); *United States v. Dansker*, 537 F.2d 40 (3rd Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Courts prefer to try jointly-indicted defendants together, particularly when the defendants are charged with conspiracy, and the co-conspirators may be tried together even if the evidence against one defendant greatly outweighs the evidence against the others. *United States v. Witschner*, 624 F.2d 840, 845 (8th Cir.), *cert. denied*, 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 291 (1980). *See also* Rule 8(b) Fed.R.Crim.P. Accordingly, the defendant Bermudez' motion to dismiss the indictment or, in the alternative, for a severance, is denied.

SO ORDERED.